UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

STANLEY RIMER,

                    Petitioner,

     v.

RENEE BAKER,[1] *et al.*,

                    Respondents.

Case No. 3:18-cv-00023-MMD-CSD

ORDER

## I.    SUMMARY

Petitioner Stanley Rimer, who was sentenced to eight to 30 years in prison after being found guilty by a jury of one count of involuntary manslaughter, one count of child neglect or endangerment resulting in substantial bodily harm, and five counts of child abuse or neglect, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF Nos. 17 ("Petition"); 18-3.) This matter is before this Court for adjudication of the merits of Rimer's amended petition, in which Rimer alleges: (1) his trial counsel was ineffective, (2) there was insufficient evidence to support his convictions, (3) Nevada's child abuse or neglect statute is unconstitutionally vague, (4) the state district court erred in refusing to sever his charges and sever his trial from his co-defendant, (5) there was prosecutorial misconduct, and (6) cumulative error. (ECF No. 17.) For the reasons discussed below, the Court denies the Petition but grants a Certificate of Appealability for grounds 4 and 5 only.

---

[1]The inmate locator page on the state corrections department's website indicates that Rimer was granted parole on November 1, 2019. Should there be any further proceedings in this federal matter, the parties should substitute a proper current respondent in the place of Rimer's former physical custodian, Renee Baker. The 1976 Advisory Committee Notes to Subdivision (b) of Rule 2 of the Rules Governing Section 2254 Cases suggest the proper respondent for a petitioner who is on parole is "the particular . . . parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    BACKGROUND[2]

Rimer and his wife, Colleen Rimer (hereinafter "Colleen"), had eight children: Stanley Rimer III (hereinafter "Stanley III"), Brandon Rimer (hereinafter "Brandon"), C.R., A.R., Q.R., E.R., S.R., and J.R.[3] (ECF No. 30-36 at 131-32.) At the time of Rimer's trial in 2011, Stanley III was 24 years old, Brandon was 22 years old, C.R. was 20 years old, A.R. was 18 years old, Q.R. was 17 years old, E.R. was 14 years old, and S.R. was 12 years old. (*Id.*) J.R., the youngest child, who was born on March 11, 2004, had myotonic dystrophy, a form of muscular dystrophy, and required a feeding tube for most of his first year of life. (ECF Nos. 30-35 at 97; 30-36 at 139; 31-1 at 212.) J.R.'s myotonic dystrophy affected his physical abilities and his ability to speak, and even though he turned 4 years old in 2008, he acted "closer to the age of 2" and still required the use of diapers. (ECF No. 30-36 at 41, 46.) Colleen, who was a stay-at-home mom and suffered from adult-onset myotonic dystrophy, and Brandon primarily cared for J.R.[4] (*Id.* at 54; ECF No. 31-1 at 204.)

On June 8, 2008, a Sunday, Rimer drove Brandon, A.R., Q.R., E.R., and S.R. to church. (ECF No. 30-37 at 23.) Colleen took J.R. to the church a little while later around 12:20 p.m. (ECF No. 30-36 at 57.) Rimer left during the church services, allegedly because he was not feeling well,[5] and Colleen and the children, with the exception of Brandon who was staying behind to discuss his mission, left the church a little after 2:00 p.m. in her Ford Excursion. (*Id.* at 58; ECF No. 30-37 at 58-59.) When they arrived home,

---

[2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Petition. Any absence of mention of a specific piece of evidence does not signify this Court overlooked it in considering Rimer's claims.

[3]The Court only refers to minor children by their initials. *See* LR IC 6-1(a)(2). The Court uses the date of the incident in question, June 8, 2008, to determine whether the Rimer children were minor children.

[4]There was testimony that Rimer never changed J.R.'s diapers. (ECF No. 30-36 at 140.)

[5]Brandon testified that there was no indication to his knowledge that Rimer was not feeling well on June 8, 2008. (ECF No. 30-37 at 24.)

Colleen asked one of the children to get J.R., who was not known to be able to unhook his seat belt, out of the car, but that did not occur. (ECF No. 30-36 at 55, 59.) The family entered the home, and Colleen, who allegedly was also not feeling well,[6] cooked dinner for approximately thirty minutes before going upstairs to join Rimer in their bedroom to take a nap and rest.[7] (*Id.* at 61.)

Later, Colleen asked a few of the children if they knew where J.R. was located. (*Id.*) The children looked for J.R. (*Id.* at 63.) Colleen "went and looked for [J.R. too, but she] didn't see him either, so [she did not] know why it slipped [her] mind." (*Id.* at 62.) Colleen went back to her bedroom, and when she came back downstairs later, she asked the children in general where J.R. was located, and "they said he was back in his bed." (*Id.* at 64.) Colleen left the residence around 5:00 p.m. to pick up Brandon, but she used Rimer's pickup truck because her Excursion did not have a lot of fuel in it. (*Id.* at 66.) Colleen and Brandon got home at 5:30 p.m., and Colleen "went straight upstairs and went to sleep." (*Id.* at 67.) After napping, Colleen watched a movie and then went to sleep for the night. (*Id.* at 68.)

Colleen woke up around 7:00 a.m. on June 9, 2008, and she went downstairs around 8:00 a.m. (*Id.* at 70.) At that point, she asked one of the children to go to the Excursion. (*Id.*) Q.R. went to the vehicle and came back inside screaming that J.R. was in the vehicle and was dead. (*Id.* at 71.) Q.R. testified that the windows of the vehicle were all the way up. (ECF No. 30-38 at 58.) Colleen tried to pick up J.R., but he was too heavy, so she laid him back down and went inside the residence and called 911. (ECF No. 30-36 at 71.) Brandon went out to the vehicle and when he was on his way back into the residence, Rimer came out of the residence and turned on the car "so he could roll down the windows." (ECF No. 30-37 at 32.)

///

---

[6]On June 14, 2008, almost a week after J.R. was left in the vehicle, Collen was diagnosed with bronchitis and sinusitis. (ECF No. 31-4 at 58.)

[7]C.R. testified that Sunday was a day of rest, so it was customary for Rimer to stay in his room on Sunday afternoons after church. (ECF No. 30-36 at 146.)

3

1     The Clark County Fire Department arrived at the Rimer residence at approximately
2   8:30 a.m., and a fire captain observed Brandon carrying J.R. "across the front sidewalk
3   area" into the residence. (ECF No. 30-35 at 82, 85, 87, 89, 94.) When responders entered
4   the residence and observed J.R. laying on the couch, "his appearance immediately
5   confirmed . . . that he had passed away." (*Id.* at 92.) J.R. was rigid and not breathing, and
6   "[h]is nose had absolutely been completely obscured by what appeared to be [a] white
7   mucus type substance." (*Id.*) Rimer "seemed rather calm" and "somewhat emotionless."
8   (*Id.* at 98.) Colleen later told detectives that she was responsible for what happened,
9   although it is unclear if she meant initially leaving J.R. in the vehicle or his ultimate death.
10  (ECF No. 30-36 at 74, 123-24.)

11    The medical examiner conducted an autopsy of J.R. and determined that J.R. "died
12  as a result of environmental heat stress." (ECF No. 30-39 at 124, 126, 138.) The shirt J.R.
13  was wearing "was filthy," and "[h]is fingernails were dirty as well." (*Id.* at 130.) The medical
14  examiner determined that J.R.'s manner of death was homicide based "upon the fact that
15  he was a small child with disabilities who had difficulty getting around, couldn't get out of
16  the car by himself and was essentially left there." (*Id.* at 140-41.)

17    A crime scene analyst for the Las Vegas Metropolitan Police Department arrived
18  at the Rimer residence on June 9, 2008. (ECF No. 30-35 at 107.) That analyst testified
19  that "each room [of the residence] had so many boxes and furniture stacked" and "so
20  much debris." (*Id.* at 109-10.) Additionally, the kitchen "counters weren't clean," there
21  were dishes that had been sitting in the kitchen sink "for a while," the floors had food that
22  had been spilled and not cleaned, the floors "had not been swept in sometime," the family
23  room "had boxes stacked all around the outside," "the master bedroom [had] boxes and
24  containers[ and] dressers covered with boxes stacked with debris," the downstairs
25  bedrooms had "so many items of clothing that it was difficult . . . to navigate the room,"
26  there were bird cages throughout the residence that "didn't appear to be maintained," and
27  there were "aquariums [that] were all algae filled." (*Id.* at 110-11; ECF No. 30-36 at 21.)
28  Similarly, C.R. testified that the Rimer residence had lots of clutter, there would be feces

1   from the dog or birds that would not be cleaned up for a day or two "until somebody

2   noticed it," and "[a] lot of times" the bathrooms, kitchen, and floors would be dirty. (ECF

3   No. 30-36 at 133–34, 154.) C.R. also testified that Rimer's house-building business

4   closed "and all that stuff that was inside of his office was moved . . . into the house." (*Id.*

5   at 149.) This resulted in the residence being unsafe from "the tools piled up." (*Id.* at 155.)

6   Further, during J.R.'s first year of life, J.R. was a part of an early intervention program,

7   and during a site visit in September 2004, the Rimer residence was smelly, unclean,

8   cluttered, and disorganized. (ECF No. 31-1 at 48.) And during later site visits, the Rimer

9   residence was cluttered and unclean and had dirty carpets and "animal feces on the floor."

10  (*Id.* at 56.)

11      In addition to the residence's cleanliness, the Rimer household had issues with

12  lice for numerous years, including "the whole time [J.R.] was alive." (ECF No. 30-36 at

13  134.) A.R.'s special education teacher testified that "[t]here were numerous instances of

14  head lice infestation[, a]nd one instance of body lice infestation," which the teacher "could

15  see . . . feeding on [A.R.'s] upper neck and cheek." (ECF No. 30-39 at 7, 11.) The teacher

16  reported the body lice situation to CPS. (*Id.* at 14.) This teacher also reported other issues

17  regarding A.R. to CPS: "[A.R.] coming to school with no shoes and instances of [A.R.]

18  coming to school without lunch money or lacking a free lunch form, so he was unable to

19  eat." (*Id.* at 15.) A CPS investigator responded to the teacher's CPS report by arriving at

20  the Rimer residence unannounced on September 16, 2005, a Friday. (*Id.* at 78, 80.)

21  Brandon told the CPS worker that Rimer and Colleen were out of town for the weekend,

22  which was concerning to the CPS investigator because there were no adults to care for

23  J.R., who was only one-year old at the time, and A.R., who had special needs. (*Id.* at 80-

24  81.)

25      Regarding punishment, C.R. testified that Rimer would use a four-foot-long oar or

26  a paint stirring stick to spank the children. (ECF No. 30-36 at 141.) According to C.R.,

27  Rimer would spank the children on the butt, which was sometimes bare, between two and

28  50 times. (*Id.* at 156.) C.R. saw Rimer hit Q.R. with a closed fist on his chest or shoulder

and saw Rimer hit her other brothers in "the chest, stomach, back, arms." (*Id.* at 143, 160.) Brandon confirmed Rimer's use of a three- or four-foot oar or a paint stick to inflict punishment, testifying that spanking "was pretty common." (ECF No. 30-37 at 8–9, 13.) Q.R. testified that Rimer had drawn teeth on the paddle, that Rimer spanked him approximately 20 times between 2004 and 2008, that Rimer punched him once with a closed fist, and that Rimer called him the devil. (ECF No. 30-38 at 38-39, 41-42.) Further, according to C.R., as a severe punishment, Rimer would send the children to bed without dinner. (ECF No. 30-36 at 170.) Q.R. testified that he was punished with only water and bread for dinner on one or two occasions. (ECF No. 30-38 at 43.)

Regarding hygiene, J.R.'s Sunday school teacher testified that on one occasion J.R. had a dirty diaper, and although Colleen was asked 3 times to change it, she kept returning J.R. with the same soiled diaper. (ECF No. 30-39 at 105, 109.) J.R.'s Sunday school teacher also testified that on the day he died, June 8, 2008, J.R. smelled like stale urine, "he had a lot of flakes in his hair," and "his hands [and fingernails] were dirty. (*Id.* at 112.) And earlier during J.R.'s early intervention program site visit in September 2004, J.R.'s program worker noticed that J.R.'s G-tube site "was leaking," was red, and appeared as if "it wasn't being cleaned properly." (ECF No. 31-1 at 49-50.) Also, J.R.'s "fingernails were black. He wasn't clean. His diaper was full." (*Id.* at 50-51.) And during a site visit in March 2005, J.R.'s G-tube site "was very necrotic looking," was very red, "[t]he skin look[ed] rotten" with oozing puss, and "it appeared that [J.R.] was uncomfortable with it." (*Id.* At 65-66.) And from for the next few months following March 2005, "[J.R.'s] fingernails . . . were never clean. The G-tube site still was not healthy. He usually was in a T-shirt and diaper which was usually full." (*Id.* at 68.)

In addition to A.R.'s special education teacher reporting issues to CPS, J.R.'s early intervention program worker observed Colleen feeding J.R. with a bottle rather than through his G-tube and reported the issue to CPS. (ECF No. 31-1 at 58-60.) In response to the CPS report, Rimer left a voicemail for the program worker, threatening to destroy her family. (*Id.* at 61.) Similarly, on a different occasion, Rimer called a CPS supervisor

and threatened that person by saying that "he was going to make everybody associated with the case - - life a living Hell." (ECF No. 30-39 at 51.)

Regarding the CPS investigations, C.R. testified that Rimer told her "[t]o not talk to CPS and law enforcement or anything" on June 9, 2008, and on previous occasions when CPS would visit. (ECF No. 30-36 at 161-62.) And Brandon testified that he saw Rimer congratulating and rewarding one of his brothers "for not saying anything about what was going on in the home" to CPS. (ECF No. 30-37 at 21-22.) A CPS investigator testified that he visited the Rimer residence twice in the summer of 2006, and on both occasions, Rimer refused to allow the investigator to enter the residence or speak with the children alone. (ECF No. 30-39 at 24-25, 28, 31, 33.)

Rimer was found guilty of the involuntary manslaughter of J.R. (count 1); child neglect or endangerment resulting in substantial bodily harm as to J.R. on June 8 and 9, 2008 (count 2); child abuse or neglect as to J.R. prior to June 8, 2008 (count 3); and child abuse or neglect as to S.R., E.R., Q.R., and A.R. (counts 4, 5, 6, 7). (ECF No. 31-11.) Colleen was found guilty of the involuntary manslaughter of J.R. (count 1); child neglect or endangerment resulting in substantial bodily harm as to J.R. on June 8 and 9, 2008 (count 2); child abuse or neglect as to J.R. prior to June 8, 2008 (count 3); child abuse or neglect as to A.R. (count 7); but not guilty of child abuse or neglect as to S.R., and E.R. (counts 4, 5, 6). (ECF No. 31-10 at 5-6.)The Nevada Supreme Court affirmed Rimer's judgment of conviction, and the Nevada Court of Appeals affirmed the denial of his post-conviction petition. (ECF Nos. 18-7; 18-12.)

III.    **STANDARD OF REVIEW**

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

7

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

1

2

## IV.    DISCUSSION

### A.    Ground 1—Ineffective Assistance of Counsel (counts 3-7)

In ground 1, Rimer alleges that his Sixth Amendment right to the effective assistance of trial counsel was violated because his counsel failed to adequately challenge counts 3-7. (ECF No. 17 at 20.) Specifically, Rimer argues that counsel failed to object to the ambiguous and missing jury instructions on counts 3-7, failed to object to prosecutorial misconduct when the prosecutor argued a theory that was contrary to the charged felonies in counts 3-7, failed to request the verdict sheet on counts 3-7 be amended to specify whether he was being convicted of child abuse or neglect as a felony or gross misdemeanor, and failed to object to the fatal variance between the amended indictment and the evidence, arguments, and instructions as to counts 3-7. (*Id.* at 24-26.) Rimer also argues that counsel's cumulative errors with respect to counts 3-7 resulted in a due process violation because they allowed him to be convicted of five felonies absent proof beyond a reasonable doubt. (*Id.* at 26.)

### 1.    Procedural Default

The Court previously determined that ground 1 was technically exhausted because it would be procedurally barred in the state courts. (ECF No. 57 at 1.) Rimer previously argued that he could demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse the default. (ECF No. 43 at 5.) This Court found that Rimer had arguably met three of the elements of *Martinez*: (1) he had no counsel during his state post-conviction habeas corpus proceedings, (2) his state post-conviction petition was the initial proceeding regarding claims of ineffective assistance of trial counsel, and (3) Nevada law requires that a claim of ineffective of assistance of trial counsel be raised in a post-conviction habeas corpus proceeding. (ECF No. 57 at 3.) However, the Court deferred consideration of the fourth element of *Martinez*: whether the claim of ineffective assistance of trial counsel is substantial. (*Id.* at 4.) This Court will now determine, pursuant

1    to a *de novo* review, whether Rimer's ineffective assistance of trial counsel claim is

2    substantial. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).[8]

3                    **2.    Background Information**

4            The amended indictment was filed on October 3, 2008. (ECF No. 28-26.) In count

5    3, the State alleged that Rimer:

6            did, on or between March 11, 2004, and June 7, 2008, willfully, unlawfully,
        and knowingly cause a child under the age of 18 years, to-wit: [J.R.], being
7        approximately 4 years of age, to suffer unjustifiable physical pain, or mental
        suffering as a result of abuse or neglect, or by placing the said baby [J.R.]
8        in a situation where he might have suffered unjustifiable physical pain or
        mental suffering as a result of abuse or neglect, by failing to provide the
9        proper care necessary for the well being of [J.R.] by exposing him to unsafe
        and/or unhealthy living conditions consisting of a foul smelling house
10       cluttered with furniture, tools, chemical containers, dirty clothes, animals,
        filthy aquariums, and/or by providing minimal food and/or by failing to
11       provide adequate medical care and/or failing to clean baby [J.R.]

12   (ECF No. 28-26 at 4.) In count 4, the State alleged that Rimer:

13           did, on or between March 11, 2004, and June 9, 2008, willfully, unlawfully,
        and knowingly cause a child under the age of 18 years, to-wit: [S.R.], being
14       approximately 9 years of age, to suffer unjustifiable physical pain, or
        mental suffering as a result of abuse or neglect, or by placing the said
15       [S.R.] in a situation where he might have suffered unjustifiable physical
        pain or mental suffering as a result of abuse or neglect, by failing to provide
16       the proper care necessary for the well being of [S.R.] by exposing him to
        unsafe and/or unhealthy living conditions consisting of a foul smelling
17       house cluttered with furniture, tools, chemical containers, dirty clothes,
        animals, filthy aquariums, and/or by providing minimal food and/or by
18       withholding and limiting food intake of [S.R.] and or by causing or allowing
        verbal abuse and/or by causing or allowing excessive corporal punishment
19       and/or by exposing [S.R.] to lice without proper care and treatment.

20   (*Id.* at 4-5.) Count 5, regarding E.R., who was approximately 12 years of age, mirrors

21   count 4. (*Id.* at 5.) In count 6, the State alleged that Rimer:

22           did, on or between March 11, 2004, and June 9, 2008, willfully, unlawfully,
        and knowingly cause a child under the age of 18 years, to-wit: [Q.R.], being
23       approximately 14 years of age, to suffer unjustifiable physical pain, or mental
        suffering, or by placing the said [Q.R.] in a situation where he might
24       have suffered unjustifiable physical pain or mental suffering, by failing to
        provide the proper care necessary for the well being of [Q.R.] by exposing
25       him to unsafe and/or unhealthy living conditions consisting of a foul smelling
        house cluttered with furniture, tools, chemical containers, dirty clothes,

26

27           [8]Respondents argue that *Martinez* is inapplicable because Rimer raised ineffective
     assistance of counsel claims in his state habeas petition. (ECF No. 68 at 17 (citing *Senior
28   v. Gilbert*, 720 F. App'x 882, 883 (9th Cir. 2018)).) However, Respondents fail to articulate
     or demonstrate that Rimer raised the specific allegations in ground 1 within his state
     habeas petition. (*See id.* at 17-18.)

                                            10

animals, filthy aquariums, and/or by providing minimal food and/or by withholding and limiting food intake of [Q.R.] and or by causing or allowing verbal abuse and/or by causing or allowing excessive corporal punishment and/or by exposing [Q.R.] to lice without proper care and treatment.

(*Id.* at 5-6.) In count 7, the State alleged that Rimer:

did, on or between March 11, 2004, and June 9, 2008, willfully, unlawfully, and knowingly cause a child under the age of 18 years, to-wit: [A.R.], being approximately 15 years of age, to suffer unjustifiable physical pain, or mental suffering as a result of abuse or neglect, or by placing the said [A.R.] in a situation where he might have suffered unjustifiable physical pain or mental suffering as a result of abuse or neglect, by failing to provide the proper care necessary for the well being of [A.R.] by exposing him to unsafe and/or unhealthy living conditions consisting of a foul smelling house cluttered with furniture, tools, chemical containers, dirty clothes, animals, filthy aquariums, and/or by providing minimal food and/or by withholding and limiting food intake of [A.R.] and or by causing or allowing verbal abuse and/or by causing or allowing excessive corporal punishment and/or by exposing [A.R.] to lice without proper care and treatment and/or failing to get medical attention for his disabilities.

(*Id.* at 6.)

### 3.     Child Abuse and Neglect

Nevada law defines child abuse and neglect as either (1) "willfully [causing] a child . . . to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or [placing a child] in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect," or (2) "permit[ting] or allow[ing a] child to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or [placing a child] in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect." NRS §§ 200.508(1), (2).

A conviction under NRS § 200.508(1) is always a felony. A conviction under NRS § 200.508(2) is a felony if it results in substantial bodily or mental harm or if the person had previously been convicted of similar conduct; however, if it does not result in substantial bodily or mental harm and the defendant has not previously been convicted of similar conduct, it is a gross misdemeanor.

///

///

11

### 4.     Ineffective Assistance of Counsel Standard

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### 5.     Analysis

The amended indictment did not specify which section of NRS § 200.508 Rimer was being charged under, nor did it specify whether he was being charged with felonies or gross misdemeanors. (ECF No. 28-26 at 2.) However, the language within the amended indictment tracks NRS § 200.508(1)—willfully causing physical pain or mental suffering. (*See id.* at 4-6.) Indeed, at Rimer's sentencing hearing, after noting that the Department of Parole and Probation had recommended that counts 3-7 be treated as gross misdemeanors, the prosecutor requested that counts 3-7 be treated as felonies because "they're all charged as felonies." (ECF No. 31-13 at 14.) The state district court agreed, indicating that it was going to adjudicate counts 3-7 as felonies. (*Id.* at 30-31.) This Court will now address Rimer's five specific allegations regarding counsel's handling of counts 3-7.

1

### a.    Jury Instructions (counts 3-7)

2      Jury Instruction No. 9 provided:

3      A person is guilty of the offense of Child Abuse if:
        (1)    the person willfully causes a child who is less than 18 years of age:
4               (a)    to suffer unjustifiable physical pain or mental suffering as a
                       result of abuse or,
5               (b)    to be placed in a situation where the child may suffer physical
                       pain or mental suffering as the result of abuse.

6

7      (ECF No. 31-9 at 14.) Relatedly, Jury Instruction No. 10 provided:

8      A person is guilty of the offense of Child Neglect or Endangerment if:
        (1)    the person willfully causes a child who is less than 18 years of age:
9               (a)    to suffer unjustifiable physical pain or mental suffering as a
                       result of neglect or,
10              (b)    to be placed in a situation where the child may suffer physical
                       pain or mental suffering as the result of neglect;
11     OR
        (2)    the person is responsible for the safety or welfare of a child who is
12             less than 18 years of age and permits or allows that child:
                (a)    to suffer unjustifiable physical pain or mental suffering as a
13                     result of neglect or,
                (b)    to be placed in a situation where the child may suffer physical
14                     pain or mental suffering as the result of neglect.

15     (*Id.* at 15.)

16          While Rimer acknowledges that Jury Instruction No. 9 "tracked section 1 of §

17     200.508," he argues that Jury Instruction No. 10 "tracked both sections 1 and 2 of the

18     statute," thereby permitting the jury to convict Rimer of a felony under the gross

19     misdemeanor standard. (ECF No. 73 at 14-15.) It is true that the jury instructions did not

20     inform the jury which instructions applied to counts 3-7, so the jurors could have

21     theoretically applied the second portion of Jury Instruction 10,[9] which tracked NRS §

22     200.508(2), the gross misdemeanor portion of the statute, to convict Rimer of felonies

23     in counts 3-7.

24          It appears that Rimer's counsel may have acted to try to avoid this issue. During

25     discussions about jury instructions, regarding counts 3-7, the state district court stated

26     that it did not "agree with the defense proposition that somehow [the jury has] to be

27

28          [9]It appears that Jury Instruction No. 10 was meant to apply to count 2, the charge
       of child neglect or endangerment with substantial bodily harm. (*See* ECF No. 31-9 at 24.)

1   unanimous on what theory of conduct is neglectful in their mind." (ECF No.31-4 at 25.)

2   However, even if Rimer's counsel was deficient for failing to argue that the jury

3   instructions should have been clearer regarding which instruction(s) applied to counts

4   3-7, Rimer fails to demonstrate prejudice. *See Strickland*, 466 U.S. at 688, 694.

5       In affirming Rimer's judgment of conviction, the Nevada Supreme Court held that

6   "the jury was properly instructed on counts 3 through 7." (ECF No. 18-7 at 31.)

7   Therefore, Rimer fails to demonstrate a reasonable probability that the result of the jury

8   instruction discussions would have been different—i.e., that the state district court would

9   have altered the jury instructions regarding counts 3-7—if his counsel had made a

10  request to do so. *See Strickland*, 466 U.S. at 694. And further, as is discussed in ground

11  2, Rimer also fails to demonstrate a reasonable probability that the result of his trial

12  would have been different—i.e., that the jury would not have found him guilty of counts

13  3-7—if the jury instructions had clearly articulated that counts 3-7 required willful conduct

14  because there was sufficient evidence to sustain Rimer's conviction for willfully abusing

15  or neglecting his children in counts 3-7. *Id.*

16          **b.    Failure to Object to Prosecutor's Argument (counts 3-7)**

17      Rimer argues that the prosecutor argued a theory that was contrary to the

18  charged felonies in counts 3-7, and his counsel failed to object. (ECF No. 73 at 19.)

19  During closing arguments, the prosecutor commented, *inter alia*, that (1) "who knew

20  better than Stanley Rimer" about the "crimes that were being committed inside the Rimer

21  home on a monthly basis," (2) "[w]hat evidence is there to show you that he knew full

22  well what was going on inside the home and that it was criminal," (3) "[w]hat other

23  evidence is there that compels the conclusion of Stanley Rimer's knowledge of the

24  crimes occurring in his home," and (4) "[w]e have charged and alleged . . . a number of

25  different acts that occurred inside the home that you can find one more or all of them to

26  exist to establish abuse or neglect or neglect and endangerment." (ECF No. 31-4 at 100-

27  01, 107.) Because these arguments center on Rimer's knowledge—rather than his willful

28  conduct—of the abuse and neglect allegations, it appears that Rimer's counsel could

1  have objected to these arguments on the basis to which he now argues: the prosecutor

2  argued a theory that was contrary to the charged felonies in counts 3-7.

3       It is unclear why Rimer's counsel did not object to any of these arguments,

4  especially since Rimer's counsel had moved prior to trial to dismiss the indictment and

5  stay the proceeding based, *inter alia*, on an argument that "the indictment lacks sufficient

6  specificity allowing the prosecutor to change theories mid-trial." (ECF No. 30-22.)

7  However, it could be that the decision not to object was strategic. *See Richter*, 562 U.S.

8  at 106 ("Rare are the situations in which the 'wide latitude counsel must have in making

9  tactical decisions' will be limited to any one technique or approach."). Rimer's counsel

10  may have preferred to address the issue in his closing argument. (*See, e.g.,* ECF No.

11  31-4 at 122-23 (Rimer's counsel's closing argument that "[t]he State failed to prove that

12  the incidents of neglect in that home rose to the level of criminal felony neglect")).

13       However, even if Rimer's counsel acted deficiently in not objecting to the

14  prosecutor's closing argument, Rimer fails to demonstrate a reasonable probability that

15  the result of his trial would have been different—i.e., that the jury would not have found

16  him guilty of counts 3-7—if he would have objected to the prosecutor's closing argument

17  because (1) the jury was instructed that "arguments . . . of counsel are not evidence in

18  the case" (ECF No. 31-9 at 28) and (2) there was sufficient evidence to sustain Rimer's

19  felony convictions in counts 3-7, as is further discussed in ground 2. *See Strickland*, 466

20  U.S. at 694.

21                          **c.    Verdict Sheet**

22       On the verdict form, counts 3-7 all had a title of "Child Abuse or Neglect" and then

23  provided the corresponding child's name. (ECF No. 31-11 at 3–4.) The jury was then

24  given the option of finding Rimer "Guilty of Child Abuse or Neglect" or "Not Guilty." (*Id.*)

25  Rimer argues that this was insufficient because it did not specify whether the jury was

26  finding him guilty of child abuse or neglect as a felony or as a gross misdemeanor. (ECF

27  No. 73 at 21.)

28  ///

                                        15

Rimer's counsel did not request that the verdict form be amended in any way. (*See* ECF No. 31-4 at 43-46.) And because counts 3-7 were plead as felonies, it is not immediately apparent that counsel's lack of request to include the option of finding Rimer guilty of gross misdemeanors was deficient. Indeed, it may have been a strategic decision to not request the option of finding Rimer guilty of gross misdemeanors be included as lesser included crimes on the verdict sheets because Rimer's counsel may have been confident that the jury would find him not guilty of counts 3-7 if they were only given the options of finding him guilty of felonies or finding him not guilty—as opposed to also being given the intermediate option of finding him guilty of gross misdemeanors. *See Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time.").

However, as was discussed previously, Rimer also fails to demonstrate a reasonable probability that the result of his trial would have been different—i.e., that the jury would not have found him guilty of felonies in counts 3-7—if the jury would have been given the option of instead finding him guilty of gross misdemeanors in counts 3-7 because there was sufficient evidence to sustain Rimer's felony convictions in counts 3-7. *See Strickland*, 466 U.S. at 694.

### d.   Variance Between Indictment and Evidence, Arguments, and Instructions

Rimer argues that the variance between the indictment and the evidence, the prosecutor's argument, and the jury instructions allowed him "to be convicted based on his being a parent and permitting or allowing his children to suffer harm, rather than actually causing it." (ECF No. 73 at 23 (citing *Berger v. United States*, 295 U.S. 78, 82 (1935) (explaining that where there is a variance between "the allegations [in an indictment] and proof [at trial]," the inquiry is "whether there has been such a variance as to 'affect the substantial rights' of the accused'")).)

The Court disagrees that there was a variance. The amended indictment charged Rimer with felony child abuse or neglect and, as has been discussed several times in

this ground, there was evidence presented at trial that Rimer willfully abused or neglect his children. As such, Rimer's counsel was not deficient for not objecting to the alleged variance. *See Strickland*, 466 U.S. at 688.

### e.     Cumulative Error (counts 3-7)

The Court has not identified any definite errors on the part of Rimer's counsel regarding counts 3-7, so there are no errors to cumulate. In sum, ground 1 is not substantial for purposes of *Martinez*, is procedurally defaulted, and is therefore dismissed.

### B.     Ground 2—Sufficiency of the Evidence

In ground 2, Rimer alleges that his right to due process was violated because the evidence presented at his trial was insufficient to sustain his convictions. (ECF No. 17 at 27.)

### 1.     Sufficiency of the Evidence Standard

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The evidence is to be viewed "in the light most favorable to the prosecution." *See id.* Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16. Regarding count 1, involuntary manslaughter,

1   Nevada law provides that "involuntary manslaughter is the killing of a human being,

2   without any intent to do so, in the commission of an unlawful act, or a lawful act which

3   probably might produce such a consequence in an unlawful manner." NRS § 200.070(1).

4   Regarding counts 2 through 7, as was discussed partially in ground 1, Nevada law

5   provides that child abuse or neglect is either (1) "willfully [causing] a child . . . to suffer

6   unjustifiable physical pain or mental suffering as a result of abuse or neglect or [placing

7   a child] in a situation where the child may suffer physical pain or mental suffering as the

8   result of abuse or neglect," or (2) "permit[ting] or allow[ing a] child to suffer unjustifiable

9   physical pain or mental suffering as a result of abuse or neglect or [placing a child] in a

10  situation where the child may suffer physical pain or mental suffering as the result of

11  abuse or neglect." Nev. Rev. Stat. § 200.508(1),(2). "Abuse or neglect" is defined as

12  "physical or mental injury of a nonaccidental nature, sexual abuse, sexual exploitation,

13  negligent treatment or maltreatment of a child under the age of 18 years . . . under

14  circumstances which indicate that the child's health or welfare is harmed or threatened

15  with harm." NRS § 200.508(4)(a). And allow and permit are defined, respectively, as "to

16  do nothing to prevent or stop the abuse or neglect of a child in circumstances where the

17  person knows or has reason to know that the child is abused or neglected" and

18  "permission that a reasonable person would not grant and which amounts to a neglect

19  of responsibility attending the care, custody and control of a minor child." NRS §

20  200.508(4)(b),(c).

21              **2.    State Court Determination**

22      In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

23      Rimer claims that the State failed to present evidence that he caused his
        children to suffer unjustifiable physical pain or mental suffering, permitted
24      or allowed the abuse or neglect that resulted in [J.R.]'s death, and
        committed an act that led to [J.R.]'s death. We review the evidence in the
25      light most favorable to the prosecution and determine whether a "rational
        trier of fact could have found the essential elements of the crime[s] beyond
26      a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Mitchell
        v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). Here, the jury heard
27      testimony that revealed a pattern of child abuse and neglect. Rimer placed
        his children in harm's way by subjecting them to deplorable living conditions,
28      dispensing excessive corporal punishment, and concealing their unsafe and
        unhealthy environment from CPS. Rimer failed to provide adequate care

                                            18

1

2    and supervision for his special-needs child, [J.R.], who required constant
     attention and yet was often left filthy, in need of clean diapers, and suffering

3    from an unhealthy G-tube site. And, Rimer withdrew to his bedroom and
     failed to check on the condition and whereabouts of his special-needs child

4    during the 17-hour period that preceded the discovery of the child's body.
     We conclude that sufficient evidence supports Rimer's conviction for child

5    abuse and neglect and involuntary manslaughter. *See* NRS 200.070; NRS
     200.508. It is for the jury to determine the weight and credibility to give

6    conflicting testimony, and the jury's verdict will not be disturbed on appeal
     where, as here, substantial evidence supports its verdict. *See Bolden v.*

     *State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

7    (ECF No. 18-7 at 20-21.)

8           **3.      Analysis—Involuntary Manslaughter (count 1) and Child**

9           **Neglect Resulting in Substantial Bodily Harm (count 2)**

10          Rimer argues that there is no evidence that he knew or had any reason to know

11   of the tragic events unfolding in the Excursion on June 8, 2008. (ECF No. 17 at 28.)

12   Even though Rimer came home early from church on June 8, 2008, and spent the

13   remainder of the day in his bedroom, he had reason to question J.R.'s whereabouts and

14   wellbeing because (1) Colleen spent most of the remainder of June 8, 2008 also in the

15   bedroom with Rimer, (2) J.R. was not present in the bedroom with his parents, (3) J.R.

16   had special needs and required constant attention, and (4) there was no other adult in

17   the residence to care for J.R.

18          Regarding count 1, viewing the evidence "in the light most favorable to the

19   prosecution" (*Jackson*, 443 U.S. at 319), which would support a finding that J.R. died

20   due to Rimer's unlawful act of passive child neglect, the Nevada Supreme Court's

21   determination that sufficient evidence supported Rimer's involuntary manslaughter

22   conviction was not based on an unreasonable determination of the facts and constitutes

23   an objectively reasonable application of clearly established federal law. *In re Winship*,

24   397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. § 200.070(1).

25          Regarding count 2, again viewing the evidence "in the light most favorable to the

26   prosecution" (*Jackson*, 443 U.S. at 319), which would support a finding that Rimer was

27   responsible for the safety and welfare of his son, J.R., and permitted or allowed J.R. to

28   suffer unjustifiable physical pain as a result of neglect resulting in substantial bodily

                                            19

1   harm, the Nevada Supreme Court's determination that sufficient evidence supported

2   Rimer's conviction in count 2 was not based on an unreasonable determination of the

3   facts and constitutes an objectively reasonable application of clearly established federal

4   law. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; NRS § 200.508(2).

5             **4.      Analysis—Child Abuse or Neglect (counts 3-7)**

6         Regarding J.R., who had special needs, there was evidence admitted that J.R.

7   was often filthy, was often left in soiled diapers, and was left without adult supervision.

8   When J.R. was an infant, his G-tube site was not adequately cleaned, causing the site

9   to be "necrotic looking" and causing J.R. discomfort. Regarding A.R., who also had

10  special needs, there was evidence admitted that he suffered from body lice on at least

11  one occasion, was sent to school with no shoes, was left without adult supervision, and

12  was not provided lunch, money, or a free-lunch form for him to eat at school. Regarding

13  Q.R., there was evidence admitted that Rimer called him the Devil. And regarding the

14  children generally, there was evidence admitted that Rimer would commonly spank the

15  children with a four-foot-long oar up to 50 times, that Rimer would occasionally punch

16  the children with a closed fist, that Rimer would send the children to bed without dinner

17  as punishment, that the Rimer household had issues with lice for years, and that the

18  Rimer residence was unsanitary. Regarding the last point, there was evidence admitted

19  that the residence contained unnecessary debris, was excessively cluttered, was

20  unsafe, was dirty, and often had uncleaned animal feces on the floors.

21        Viewing this evidence "in the light most favorable to the prosecution" (*Jackson*,

22  443 U.S. at 319), which would support a finding that Rimer willfully caused or placed his

23  children, J.R., S.R., E.R., Q.R., and A.R., in a situation where they could suffer

24  unjustifiable physical pain or mental suffering as a result of abuse or neglect, the Nevada

25  Supreme Court's determination that sufficient evidence supported Rimer's convictions

26  in counts 3-7 was not based on an unreasonable determination of the facts and

27  constitutes an objectively reasonable application of clearly established federal law. *In re*

28  *Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; NRS § 200.508(1).

1    In sum, Rimer is not entitled to federal habeas relief for ground 2.

2    **C.    Ground 3—Constitutionality of Nevada's Child Abuse or Neglect**

3          **Statute**

4    In ground 3, Rimer alleges that Nevada's child abuse or neglect statute is

5    unconstitutionally vague. (ECF No. 17 at 32.)

6          **1.    Vagueness Standard**

7    "[T]he Government violates [due process of law] by taking away someone's life,

8    liberty, or property under a criminal law so vague that it fails to give ordinary people fair

9    notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."

10   *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015); *see also Giaccio v. Pennsylvania*,

11   382 U.S. 399, 402-03 (1966) ("It is established that a law fails to meet the requirements

12   of the Due Process Clause if it is so vague and standardless that it leaves the public

13   uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without

14   any legal fixed standards, what is prohibited and what is not in each particular case.").

15   This principle applies "to statutes defining elements of crimes" and "to statutes fixing

16   sentences." *Johnson*, 135 S.Ct. at 2557. Regarding the former, "the void-for-vagueness

17   doctrine requires that a penal statute define the criminal offense with sufficient

18   definiteness that ordinary people can understand what conduct is prohibited and in a

19   manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v.*

20   *Lawson*, 461 U.S. 352, 357 (1983); *see also Hess v. Bd. of Parole & Post-Prison*

21   *Supervision*, 514 F.3d 909, 913 (9th Cir. 2008) ("[A] state law must establish adequate

22   guidelines to govern the exercise of discretion by state officials so that the law neither

23   'authorizes [n]or even encourages arbitrary and discriminatory enforcement.'" (quoting

24   *Hill v. Colorado*, 530 U.S. 703, 732 (2000))).

25         **2.    State Court Determination**

26   In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

27         Rimer claims that NRS 200.508 is unconstitutionally vague because no
            reasonable person would understand the prohibition on child abuse and
28         neglect to include leaving a child in the care of his or her mother or
            criminalizing foul odors, cluttered houses, dirty aquariums, low food

supplies, sending children to bed without supper, calling children nonprofane names, spanking children, or failing to expediently eradicate a lice problem. "We review the constitutionality of a statute de novo, presuming that a statute is constitutional." *Clancy v. State*, 129 Nev., Adv. Op. 89, 313 P.3d 226, 231 (2013). Nevada's child-abuse-and-neglect statute plainly authorizes criminal penalties for an adult who either willfully or passively places a child "in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect," NRS 200.508(1), (2), and adequately defines its terms so that a person of ordinary intelligence would have notice of the prohibited conduct. *Smith v. State*, 112 Nev. 1269, 1276, 927 P.2d 13, 18 (1996), *abrogated on other grounds by City of Las Vegas v. Eighth Judicial Dist. Court*, 118 Nev. 859, 862-63, 59 P.3d 477, 480 (2002), *abrogated on other grounds by State v. Castaneda*, 126 Nev. 478, 482 n.1, 245 P.3d 550, 553 n.1 (2010). Consequently, we conclude that Rimer has failed to make a clear showing that the statute is unconstitutional as applied to him or otherwise overcome the statute's presumed constitutionality. *See Clancy*, 129 Nev., Adv. Op. 89, 313 P.3d at 231 (setting forth the test for unconstitutional vagueness).

(ECF No. 18-7 at 22.)

### 3.    Analysis

As the Nevada Supreme Court reasonably determined, NRS §§ 200.508(1), (2), which this court outlined in grounds 1 and 2, plainly defines child abuse or neglect as either (1) willfully causing a child to "suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect" or placing a child "in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect," or (2) passively permitting or allowing a "child to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect" or placing a child "in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect." And NRS § 200.508(4) then defines "abuse or neglect," "allow," "permit," "physical injury," and "substantial bodily harm."

Rimer fails to demonstrate that NRS § 200.508 (1) does not define child abuse or neglect "with sufficient definiteness" or (2) "encourage[s] arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357; *see, e.g.*, *Bush v. Wolfson*, Case No. 2:19-cv-01096-RFB-VCF, 2020 WL 1324990, at *9 (D. Nev. Mar. 20, 2020) (determining that NRS § 200.508 is not unconstitutional). Thus, the Nevada Supreme Court's determination that Rimer failed to show that NRS § 200.508 is unconstitutional was

1   neither contrary to, nor an unreasonable application of, clearly established federal law.

2   Rimer is not entitled to federal habeas relief for ground 3.

3         **D.   Ground 4—Joinder of Charges**

4         In ground 4, Rimer alleges that his right to due process and a fair trial were violated

5   when the state district court refused to sever the child abuse or neglect charges (counts

6   3-7, "abuse charges") from the charges relating to J.R.'s death (counts 1-2, "death

7   charges"). (ECF No. 17 at 35.) Rimer moved to sever the death charges from the abuse

8   charges before trial, arguing that "[t]here is an obvious and substantial risk that a jury

9   could look at the child abuse counts, and determine that based upon them [Rimer] was a

10  bad man, and use that determination to convict him of the more serious murder charge."

11  (ECF No. 28-31 at 17.) The state district court denied the motion to sever the counts,

12  finding that "there is an element of allegations of neglect in all of" the counts and

13  concluding that the evidence of both sets of charges would be cross-admissible even if

14  the counts were severed and tried separately. (ECF No. 29-4 at 28.)

15        **1.   Severance of Counts Standard**

16        The Supreme Court cross-applies its reasoning for relief from prejudicial joinder in

17  cases involving severance of counts and severance of defendants. *See United States v.*

18  *Lane*, 474 U.S. 438 (1986) (addressing allegedly misjoined counts); *Zafiro v. United*

19  *States*, 506 U.S. 534, 539 (1993) (addressing allegedly misjoined defendants, citing to

20  *Lane*). The Supreme Court has stated in a footnote: "Improper joinder does not, in itself,

21  violate the Constitution. Rather, misjoinder would rise to the level of a constitutional

22  violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment

23  right to a fair trial." *Lane*, 474 U.S. at 466 n.8 (1986); *see also Zafiro*, 506 U.S. at 539

24  (holding that a court should grant a severance under Federal Rule of Criminal Procedure

25  14 "only if there is a serious risk that a joint trial would compromise a specific trial right of

26  one of the defendants, or prevent the jury from making a reliable judgment about guilt or

27  innocence").

28  ///

1   The Ninth Circuit has declared this statement in *Lane* to be dicta and held that

2   "neither *Zafiro v. United States* nor *United State v. Lane* establish a constitutional

3   standard binding on the state requiring severance in cases where defendants present

4   mutually antagonistic defense." *Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir.

5   2010); *see also Runningeagle v. Ryan*, 686 F.3d 758, 774 (9th Cir. 2012) ("[T]here is no

6   clearly established federal law requiring severance of criminal trials in state court even

7   when the defendants assert mutually antagonistic defenses."). This holding also appears

8   to apply to severance of charges. *See Martinez v. Yates*, 585 F. App'x 460, 460 (9th Cir.

9   2014) ("There is no clearly established Supreme Court precedent dictating when a trial in

10  state court must be severed."); *see also Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th

11  Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of

12  a motion to sever can, in itself, violate the Constitution.").

13      Because there is no clearly established Supreme Court precedent, Rimer has not

14  shown that the Nevada Supreme Court acted contrary to Supreme Court precedent in

15  determining that he was not entitled to relief on his severance claims. *See* 28 U.S.C. §

16  2254(d)(1); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (explaining that "it

17  cannot be said that the state court unreasonably applied clearly established Federal law"

18  when United States Supreme Court precedent "give[s] no clear answer to the question

19  presented" (internal quotation marks and alterations omitted)).

20              **2.    State Court Determination**

21      Regarding ground 4, in affirming Rimer's judgment of conviction, the Nevada

22  Supreme Court held:

23          Rimer claims that the district court erred by denying his pretrial motion to
        sever the child-abuse-and-neglect counts (the abuse charges) from the
24          second-degree-murder and child-abuse-and-neglect-causing-substantial-
        bodily-harm counts (the death charges). Rimer argued in the court below
25          that the abuse charges and the death charges were improperly joined under
        NRS 173.115 and, alternatively, even if the initial joinder was proper,
26          severance was required by NRS 174.165(1) because the joinder was
        unfairly prejudicial.
27
        *A. Standard of review*
28

24

The decision to join or sever charges falls within the district court's discretion. *Weber v. State*, 121 Nev. 554, 570, 119 P.3d 107, 119 (2005). We review the exercise of this discretion by determining whether a proper basis for the joinder existed and, if so, whether unfair prejudice nonetheless mandated separate trials. *Id.* at 571, 119 P.3d at 119. We base our review on the facts as they appeared at the time of the district court's decision. *See People v. Boyde*, 758 P.2d 25, 34 (Cal. 1988); *People v. Brawley*, 461 P.2d 361, 369-70 (Cal. 1969) ("[T]he propriety of the denial of a motion for separate trials must, of course, be tested as of the time of the submission of the motion, and the question of error cannot be determined in the context of subsequent developments at the trial." (citations omitted)). And, if we conclude that the charges were improperly joined, we review for harmless error and reverse only if "the error had a substantial and injurious effect or influence in determining the jury's verdict." *Tabish v. State*, 119 Nev. 293, 302, 72 P.3d 584, 590 (2003) (internal quotations omitted); *see also United States v. Lane*, 474 U.S. 438, 449 (1986).

## B. Bases for joinder

A proper basis for joinder exists when the charges are "[b]ased on the same act or transaction; or . . . [based] on two or more acts or transactions connected together or constituting parts of a common scheme or plan." NRS 173.115. Here, the abuse charges and the death charges are not based on the same act or transaction and the facts do not demonstrate that Rimer had a single scheme or plan encompassing the abuse of his children and the death of his four-year-old son. Consequently, the charges are only properly joined if they are "connected together."

### 1. Connected together

In *Weber*, we clarified that "for two charged crimes to be 'connected together' under NRS 173.115(2), a court must determine that evidence of either crime would be admissible in a separate trial regarding the other crime." 121 Nev. at 573, 119 P.3d at 120. We also stated that evidence of a crime may be admissible in a trial for another crime if it is admissible under NRS 48.045(2) and satisfies the requirements in *Tinch* by being "relevant, . . . proven by clear and convincing evidence, and [having] probative value that is not substantially outweighed by the risk of unfair prejudice." *Id.* (citing *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997)). However, in stating this test for the admissibility of evidence of other crimes, we failed to consider the difference between the procedural issue of joinder of offenses and the evidentiary issue of admitting evidence of "other crimes." *See Solomon v. State*, 646 A.2d 1064, 1066 (Md. Ct. Spec. App. 1994) (observing that the procedural issues of joinder and severance are not the same as the evidentiary issue of "other crimes" evidence and they call for different analyses).

The admissibility of evidence of "other crimes, wrongs or acts" is an evidentiary issue that may arise at any time during the course of a trial, and the district court's evaluation of that evidence's relevance, reliability, and risk of unfair prejudice is necessary to ensure that the evidence is subjected to some form of procedural safeguard before it has a chance to influence the jury. *See Petrocelli v. State*, 101 Nev. 46, 51 n.3, 51-52, 692 P.2d 503, 507 n.3, 507-08 (1985) (quoting NRS 48.045(2)), *superseded in part by statute as stated in Thomas v. State*, 120 Nev. 37, 45, 83 P.3d 818, 823 (2004). In contrast, the joinder of offenses is a procedural issue that is decided before a trial and does not compel the same safeguards as

evidence that is introduced after a trial has started. *See generally Brown v. State*, 114 Nev. 1118, 1126, 967 P.2d 1126, 1131 (1998) (recognizing joinder as a procedural rule).

In a joinder decision there is no need to prove a defendant's participation in the charged crimes by clear and convincing evidence because "[a]ll crimes charged, and, therefore, amenable to the possible joinder, are the considered products of grand jury indictments or criminal informations" and therefore are "of equal stature." *Solomon*, 646 A.2d at 1070; *accord State v. Cutro*, 618 S.E.2d 890, 894 (S.C. 2005). Similarly, weighing the probative value of the evidence against the danger of unfair prejudice does not provide a meaningful safeguard against improper joinder because it fails to account for the public's weighty interest in judicial economy, *see Tabish*, 119 Nev. at 304, 72 P.3d at 591; *Solomon*, 646 A.2d at 1071, and the question of unfair prejudice can be addressed separately through the prejudicial joinder statute, NRS 174.165(1). However, the district court must still consider whether the evidence of either charge would be admissible for a relevant, nonpropensity purpose in a separate trial for the other charge, *see generally Bigpond v. State*, 128 Nev., Adv. Op. 10, 270 P.3d 1244, 1249-50 (2012) (modifying the first *Tinch* factor to reflect the narrow limits of the general rule of exclusion), but we conclude that this is the only *Tinch* factor that the district court must consider when deciding whether charges are "connected together" for purposes of joinder.

## 2. Admissibility and relevancy

"The admissibility of evidence of other crimes, wrongs, or acts to establish intent and an absence of mistake or accident is well established, particularly in child abuse cases," *United States v. Harris*, 661 F.2d 138, 142 (10th Cir. 1981), where the State must often "prove its case, if at all, with circumstantial evidence amidst a background of a pattern of abuse," *United States v. Merriweather*, 22 M.J. 657, 663 (A.C.M.R. 1986) (Naughton, J., concurring). *See Bludsworth v. State*, 98 Nev. 289, 291, 646 P.2d 558, 559 (1982) (evidence of prior injuries is admissible as "independent, relevant circumstantial evidence tending to show that the child was intentionally, rather than accidently, injured on the day in question"); *Ashford v. State*, 603 P.2d 1162, 1164 (Okla. Crim. App. 1979) (evidence of "past injuries [is] admissible to counter any claim that the latest injury happened through accident or simple negligence. The pattern of abuse is relevant to show the intent of the act."); *State v. Widdison*, 4 P.3d 100, 108 (Utah Ct. App. 2000) ("Evidence of prior child abuse, both against the victim and other children, is admissible to show identity, intent, or lack of accident or mistake."); *see also State v. Taylor*, 701 A.2d 389, 395-96 (Md. 1997) (gathering cases). Here, the abuse charges and the death charges were connected together because evidence from these charges demonstrated a pattern of abuse and neglect that would have been relevant and admissible in separate trials for each of the charges. Accordingly, we conclude that the joinder of these charges was permissible under NRS 173.115.

## C. Prejudicial joinder

Even when charges have been properly joined, some form of relief may be necessary to avert unfair prejudice to the defendant. NRS 174.165(1) provides that "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . in an indictment . . . , the court may order an election or separate trials of counts, . . . or provide whatever other relief justice requires." The defendant must demonstrate to the district court that

the joinder would be unfairly prejudicial; this requires more than a mere showing that severance may improve his or her chances for acquittal. *Weber*, 121 Nev. at 574-75, 119 P.3d at 121. Courts construing NRS 174.165(1)'s federal cognate

> have identified three related but distinct types of prejudice that can flow from joined counts: (1) the jury may believe that a person charged with a large number of offenses has a criminal disposition, and as a result may cumulate the evidence against him or her or perhaps lessen the presumption of innocence; (2) evidence of guilt on one count may "spillover" to other counts, and lead to a conviction on those other counts even though the spillover evidence would have been inadmissible at a separate trial; and (3) defendant may wish to testify in his or her own defense on one charge but not on another.

1A Charles Alan Wright & Andrew D. Leipold, *Federal Practice and Procedure* § 222 (4th ed. 2008). We have recognized that the first of these types of prejudice may occur when charges in a weak case have been combined with charges in a strong case to help bolster the former. *Weber*, 121 Nev. at 575, 119 P.3d at 122.

Like its federal counterpart, NRS 174.165(1) "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). "To *require* severance, the defendant must demonstrate that a joint trial must be manifestly prejudicial. The simultaneous trial of the offenses must render the trial fundamentally unfair, and hence, result in a violation of due process." *Honeycutt v. State*, 118 Nev. 660, 667-68, 56 P.3d 362, 367 (2002) (emphasis added) (internal quotations omitted), *overruled on other grounds by Carter v. State*, 121 Nev. 759, 765, 121 P.3d 592, 596 (2005). To resolve a motion to sever, the district court must first determine whether the joinder is manifestly prejudicial in light of the unique facts of the case and then decide "whether [the] joinder is so manifestly prejudicial that it outweighs the dominant concern [of] judicial economy and compels the exercise of the court's discretion to sever." *Tabish*, 119 Nev. at 304, 72 P.3d at 591 (internal quotation omitted).

Here, the district court expressly rejected the argument that the abuse charges unfairly bolstered the death charges because Rimer was directly implicated in the abuse charges but only indirectly implicated in the death charges. Our review of the record shows that all of the charges were strong and none of the charges were so weak as to suggest a due process violation. Accordingly, we conclude that the district court did not abuse its discretion in this regard.

(ECF No. 18-7 at 14-20.)

### 3. Analysis

Rimer has shown that the state district court's decision not to sever the death charges from the abuse charges resulted in a prejudice so great that he was deprived of a fair trial. Moreover, Rimer has shown that the Nevada Supreme Court's failure to conduct an adequate review of the state court's decision denying the motion to sever

1  counts resulting in an unreasonable application of federal law. But because it is not clear

2  that the law requiring severance of counts is clearly established, the Court must deny

3  relief for ground 4. Because the Court would grant Rimer relief on ground 4 if the law were

4  clearly established, the Court will issue a certificate of appealability so that Rimer may

5  seek review from the Ninth Circuit.

6                          **a.    The State District Court's Analysis**

7          Before his trial, Rimer challenged joinder of the abuse charges with the death

8  charges, reasoning that in a severed trial, evidence of earlier abuse or neglect of J.R. and

9  the other children would be inadmissible as either other wrongful acts or as more

10  prejudicial than probative of guilt on the death charges. (ECF No. 29-4 at 15-16.) The

11  prosecutor argued that because abuse and neglect was ongoing and was a shared

12  element between all the charges, evidence of the related conduct would be admissible to

13  show that any mistake or accident Rimer claimed caused him to fail to look for J.R. would

14  be unreasonable. (*Id.* at 19-20.) At the hearing on the motion, the prosecutor clarified that

15  it sought to prove the Rimers "were neglectful" on the day of J.R.'s death, as opposed to

16  committing "an affirmative act of abuse." (*Id.* at 20.) Because each charge was based on

17  the ongoing neglect, the prosecutor argued the evidence of the charges would be cross-

18  admissible. (*Id.* at 21.) In response, defense counsel argued that what the prosecutor was

19  seeking to do was introduce propensity evidence. (*Id.* at 23.) Moreover, even if the

20  evidence were admissible for a non-propensity purpose, "the prejudice would be so high"

21  that it would not come in during a severed trial. (*Id.*) The state district court agreed with

22  the prosecutor that the evidence would be cross-admissible. (*Id.* at 21, 28-29.)

23                          **b.    The Nevada Supreme Court's Unreasonable Application**

24                                  **of Federal Law**

25          The Court considers whether the Nevada Supreme Court's decision to deny relief

26  was contrary to, or involved an unreasonable application of, federal law. *See* 28 U.S.C. §

27  2254(d)(1). The Court finds that it was.

28  ///

The Nevada Supreme Court broke its analysis into two questions: (1) whether the counts were initially misjoined, and (2) even if they were properly joined, whether they should have been severed because joinder would unduly prejudice the defendant. (ECF No. 18-7 at 14-20.) In reviewing the first question, the court determined the counts were appropriately joined because they were "connected together" by forming a pattern of abuse. (*Id.* at 16.) Finding that the counts are "connected together" required the Nevada Supreme Court to decide that the evidence would be cross-admissible for non-propensity purposes, but did not require the court to determine whether the evidence would be otherwise excluded as more prejudicial than probative. That analysis was ostensibly reserved for the prejudicial joinder prong, but the Nevada Supreme Court omitted it there as well.

The Court does not review whether the counts were initially misjoined and focuses instead on whether the failure to sever the counts resulted in prejudice so great that Rimer was deprived of a fair trial. However, the Nevada Supreme Court did not review the state district court's determination that no prejudice would result because the evidence would be cross-admissible at hypothetically severed trials. Instead, the Nevada Supreme Court substituted its own findings on an entirely different source of prejudice—whether any weaker charges were improperly bolstered by joining them with stronger charges. (*Id.* at 19.) Nowhere in the hearing transcript does either party or the trial court itself discuss the risk of evidence spillover bolstering a weaker charge with evidence from a stronger charge. (*See* ECF No. 29-4.) While evidentiary spillover may be a source of prejudice, it is not the only source the U.S. Supreme Court or the Ninth Circuit have recognized, nor was it the source initially argued in this case. Indeed, the introduction of evidence which is relevant but that would otherwise be excluded in a severed trial is a source of potential prejudice the U.S. Supreme Court has expressly recognized. *See Zafiro*, 506 U.S. at 539. The Nevada Supreme Court's prejudice analysis was incomplete based on the procedural history and facts of this case. Even assuming the evidence were sufficient to convict Rimer on every count and the court was correct that no weaker charges were improperly

1   bolstered, prejudice still could have resulted from the introduction of inflammatory

2   evidence that would have been excluded in severed trials.

3          It is possible that the Nevada Supreme Court failed to conduct a thorough prejudice

4   analysis because it had already determined the evidence would be cross-admissible

5   under the initial misjoinder analysis. Before reaching the prejudice prong, the Nevada

6   Supreme Court found the counts were properly joined in part because evidence from the

7   abuse charges would be cross-admissible in a trial for the death charges. (ECF No.18-7

8   at 16.) Again, the Court need not review whether the counts were initially misjoined, as

9   the focus of Rimer's collateral habeas claim is prejudice. *See Estelle v. McGuire*, 502

10  U.S. 62, 71-72 (1991) (explaining that federal habeas courts grant relief based on the

11  deprivation of federal rights, not based on incorrect state law determinations). However,

12  because the Nevada Supreme Court failed to examine whether evidence would be

13  excluded in severed trials, the Court looks to the Nevada Supreme Court's cross-

14  admissibility analysis as explained in the initial misjoinder section.

15         The Nevada Supreme Court's determination that evidence from one set of charges

16  would be cross-admissible in a severed trial for the other set is erroneous under federal

17  law.[10] The court reasoned that the evidence from the abuse charges would be cross-

18

19         [10]To the extent that it is relevant, the Nevada Supreme Court's findings on this
20  question are not insulated from federal review because its state law determinations are
    not sufficiently "independent" of federal law. *See Coleman v. Thompson*, 501 U.S. 722,
21  729-735 (1991) (holding that "federal courts on habeas corpus review of state prisoner
    claims, like this Court on direct review of state court judgments, will presume that there is
22  no independent and adequate state ground for a state court decision when the decision
    'fairly appears to rest primarily on federal law, or to be interwoven with the federal law,
    and when the adequacy and independence of any possible state law ground is not clear
23  from the face of the opinion'" (quoting *Michigan v. Long*, 463 U.S. 1032, 1038 (1983))).
           The Nevada Supreme Court cited cases applying federal law, Nevada law,
24  Oklahoma law, Utah law, and Maryland law to find that evidence of other wrongs "to
    establish intent and absence of mistake or accident is well established, particularly in child
25  abuse cases . . . where the State must often prove its case, if at all, with circumstantial
    evidence amidst a background of a pattern of abuse." (ECF No. 18-7 at 17-18.) Moreover,
26  the Nevada statute governing proper joinder of offenses in a criminal complaint or
    indictment is nearly identical to Federal Rule of Criminal Procedure 8. *See* NRS §
27  173.115. The Court therefore may consider whether it is correct that the Nevada Supreme
    Court's determination that evidence from one set of charges would be cross-admissible
28  for non-propensity purposes, and how that determination affected the overall prejudice to
    Rimer.

admissible in a severed death charges trial because evidence of other wrongs is frequently introduced to prove intent in child abuse cases. (ECF No. 18-7 at 16.) But intent was not part of the prosecution's theory in this case, nor was it required to prove the death charges. The state district court noted repeatedly, and the prosecutor conceded, the connection between the abuse charges and the death charges was neglect. They were not attempting to show that either Rimer or Colleen intended to kill J.R.; rather, that they were neglectful parents who routinely neglected their children, and therefore they unreasonably neglected J.R. on the day he died. The evidence was not offered to prove intent, as the prosecutor was arguing that the neglect of J.R. was not intentional. Nor was it offered to show lack of accident or mistake, neither of which would be required to prove the death charges. Instead, evidence of the abuse charges would be offered to show that Rimer and Colleen acted in this instance in conformity with prior neglectful and abusive acts. This line of argument is prohibited by Federal Rule of Evidence 404(b)(2) and its analogue in Nevada law, NRS § 48.045(2), and almost certainly would have been excluded in severed trials.

After concluding that the evidence would be cross-admissible for non-propensity purposes, the Nevada Supreme Court never returned to the question of cross-admissibility or how the potential that some evidence may be excluded in severed trials affects the prejudice analysis. The court did not balance whether otherwise admissible evidence would be excluded from a severed trial because it was more prejudicial than probative, despite indicating that such analysis was proper under the prejudicial joinder prong. (ECF No. 18-7 at 17.) Even assuming the evidence of the abuse charges could be offered for a non-propensity purpose, it is not at all clear that the evidence would be more probative than prejudicial. As defense counsel argued at the hearing, the instances of abuse of the other Rimer children were not factually similar to the neglect that resulted in J.R.'s death. Many of the facts involved affirmative acts of abuse, including corporeal punishment. Such evidence was not necessary to show that either Rimer or Colleen criminally neglected J.R. the day he died. Moreover, the evidence relating to the abuse

1  of the other children would be highly inflammatory and of little probative value to show

2  that Rimer was responsible for J.R's death. And, as Rimer points out in his Petition, the

3  inverse is true as well—had the counts been severed, the jury hearing the abuse charges

4  almost certainly would not have heard evidence of J.R.'s death. It is difficult to imagine a

5  situation where a jury is more likely to be prejudiced than when hearing evidence that a

6  defendant was potentially responsible for leaving his four-year-old son with special needs

7  in a hot car for 17 hours in a trial for neglect or abuse of his surviving children.

8          Evidence of other wrongs is presumptively highly prejudicial, to such a degree that

9  the Federal Rules of Evidence prohibit its introduction except in limited circumstances.

10 *See, e.g.*, *United States v. Charley*, 1 F.4th 637, 647-48 (9th Cir. 2021) (reversing

11 defendant's conviction when the district court improperly permitted evidence of other

12 wrongs that did not fall within an enumerated exception). "Courts must be extremely

13 careful to guard against the danger that defendants will be convicted because they have

14 previously committed a [prior] serious criminal offense rather than because the

15 Government has introduced evidence sufficient to prove beyond a reasonable doubt." *Id.*

16 (citation omitted). "Even where 404(b) evidence falls within a permitted purpose, it should

17 be excluded under Rule 403, if the court finds that its probative value is substantially

18 outweighed by a danger of unfair prejudice." *United States v. Preston*, 873 F.3d 829, 840

19 (9th Cir. 2017). The Ninth Circuit has further clarified in the habeas context that it is

20 exceedingly difficult for jurors to compartmentalize "damaging information about one

21 defendant derived from joined counts," especially when that evidence would not have

22 been cross-admissible in severed trials and the charges are not sufficiently "simple and

23 distinct." *Bean*, 163 F.3d at 1084-85. Here, the charges were not simple and distinct, as

24 the prosecution's theory of the case relied upon drawing together a pattern of neglect

25 across charges. Moreover, the nature of child abuse and neglect charges create a higher

26 risk that a jury's emotions will be inflamed, creating a greater likelihood that the jury would

27 draw improper conclusions based on Rimer's character. It is difficult to imagine a

28 circumstance in which this risk is greater than introducing evidence that a defendant may

have been responsible for the death of his own child who was only four years old in a trial for the neglect of his other children. But as explained above, the Nevada Supreme Court never considered whether evidence of the abuse charges would be more prejudicial than probative in a severed trial for the death counts, or whether evidence of J.R.'s death would be more prejudicial than probative in a trial for the abuse of the Rimer children preceding J.R.'s death.

Finally, although the Nevada Supreme Court did not address whether the general jury instructions cured any potential prejudice from the failure to sever the counts, the Court finds they likely did not. While "[a] habeas court must presume that jurors follow the jury instructions," *Busby*, 661 F.3d at 1017, the Ninth Circuit has expressed doubt that general instructions are sufficient to cure prejudice in joined trials where the joinder creates prejudice. Although the jury instructions may have had some curative effect, both the Supreme Court and the Ninth Circuit have cautioned that "proper jury instructions might not alleviate the problems inherent in joint trials." *Lane*, 474 U.S. 458, n.22 (1986) (quoting *Blumenthal v. United States*, 332 U.S. 539, 559 (1986)); *Bean*, 163 F.3d at ("We have expressed our skepticism about the efficacy of [general] instructions . . . 'To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude beyond mortal capacities.'") (quoting *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986)). This risk is particularly acute when the evidence between charges or against separate defendants would not be cross-admissible, as well as when the crimes charged are not "simple and distinct." *Bean*, 163 F.3d at 1085. Here, the initial basis for joinder of the counts was to demonstrate a patten of abuse and neglect, precisely the type of justification which would invite the jury to draw connections between distinct acts. The Court agrees with the Ninth Circuit's reasoning in *Bean* and finds that instructing jurors to compartmentalize such inflammatory evidence is an unreasonable request and one that is unlikely to be particularly curative of the initial prejudice.

///

33

1    In sum, the failure to sever the death charges from the abuse charges prejudiced

2    Rimer to such a degree that he was deprived of a fair trial. Moreover, the Nevada

3    Supreme Court's failure to adequately consider the prejudice caused by failing to sever

4    the counts unreasonably applied federal law—the U.S. Supreme Court has clearly stated

5    that failing to sever counts, in certain circumstances, risks violating a defendant's due

6    process right to a fair trial. *See Lane*, 474 U.S. at 446 n.8; *Zafiro*, 506 U.S. at 539-40. If

7    the jury is "prevent[ed] from making a reliable judgment about guilt or innocence," the

8    defendant's rights may be compromised. *Zafiro*, 506 U.S. at 539. Despite this finding that

9    Rimer was prejudiced and the Nevada Supreme Court failed to adequately address the

10   prejudice in its habeas review, it is unclear whether the Supreme Court caselaw

11   explaining prejudicial joinder is "clearly established" such that relief is warranted under §

12   2254(d)(1). Because the Ninth Circuit suggests the law is not clearly established, the

13   Court will deny relief for ground 4. However, the Court will issue a certificate of

14   appealability so that Rimer may seek review of this ground.

15           **E.     Ground 5—Joinder of Defendants**

16           In ground 5, Rimer alleges that his right to due process and a fair trial were

17   violated when the state district court refused to sever his trial from Colleen's trial. (ECF

18   No. 17 at 35.) Before trial, Rimer argued that "the defendants have mutually exclusive

19   and antagonistic defenses" such that "acceptance of Colleen Rimer's defense would

20   preclude [his] acquittal." (ECF No. 28-30 at 4.) The state district court denied the motion,

21   finding "there's [not] anything so inconsistent in these defenses or so inherently

22   prejudicial to either Defendant of going to trial together." (ECF No. 29-4 at 12-13.)

23           The same legal standards apply to the joinder and severance of defendants as

24   counts; the Court incorporates those standards set forth in ground 4 into this section.

25   Accordingly, Rimer must also demonstrate that the Nevada Supreme Court's conclusion

26   that the state district court did not abuse its discretion in finding the defenses were not

27   inherently prejudicial was contrary to or an unreasonable application of clearly established

28   federal law or based on an unreasonable determination of the facts. The Court finds that

1    not only were the defenses were clearly mutually antagonistic and mutually exclusive, but

2    that hearing both parents claim they were not responsible for J.R.'s death would increase

3    the likelihood that the jury would find both parents guilty.  Moreover, Colleen's defense

4    that she had to rely on others in the home given the limitations due to her myotonic

5    dystrophy would also increase the likelihood that the jury would find her more sympathetic

6    and would shift responsibility to Rimer as the only other adult in the home as Rimer

7    contends. (ECF No. 17 at 39.) While mutually antagonistic defenses are not per se

8    prejudicial, the Court finds that in this case, Rimer and Colleen's defenses required

9    severance for Rimer to receive a fair trial. But because the Ninth Circuit has suggested

10   this law is not clearly established, the Court will deny ground 5, explain its reasoning, and

11   grant a certificate of appealability.

### 1.    State Court Determination

13         In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

> Rimer claims that the district court's failure to sever the joint trial deprived him of a fair trial because Colleen's inculpatory statement to police detectives was admitted into evidence, he and Colleen had mutually exclusive defenses, and the nature of their defenses gave rise to an inference that they were both guilty. We review a district court's determination of whether to sever a joint trial for abuse of discretion. *Chartier v. State*, 124 Nev. 760, 763-64, 191 P.3d 1182, 1184-85 (2008). A joint trial must be severed "'if there is a serious risk that [it] would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Marshall v. State*, 118 Nev. 642, 647, 56 P.3d 376, 379 (2002) (quoting *Zafiro*, 506 U.S. at 539). Here, Rimer informed the district court that there were no *Bruton*-type problems, *see Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that a defendant's constitutional right to confront his accusers is violated when a nontestifying codefendant's statement incriminates him and is used at their joint trial), and the district court determined that Rimer's defense—that he was sick in bed and relinquished all parenting responsibilities to Colleen—and Colleen's defense—that she had myotonic dystrophy and relied on others in the household to care for [J.R.]—were not so inconsistent or inherently prejudicial that they require severance, *see generally Marshall*, 118 Nev. 644-48, 56 P.3d 377-80 (discussing inconsistent defenses). We conclude that the district court did not abuse its discretion in this regard.

26   (ECF No. 18-7 at 22-23.)

27   ///

28   ///

35

**2.**     **Analysis**

Rimer must "demonstrate that the state court's denial of his severance motion rendered his trial 'fundamentally unfair'" in violation of due process. *Grigsby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). Because denying the motion to sever likely did prejudice Rimer in such a way that the jury was prevented "from making a reliable judgment about [Rimer's] guilt or innocence," *see Zafiro*, 506 U.S. at 539, the Court finds that he was deprived of his right to due process.

Rimer's defense was that he was sick in bed and relinquished parenting responsibilities to Colleen, while Colleen's defense was that she relied on others in the household to care for J.R. (ECF No. 30-35 at 57-58, 70, 78.) Rimer was the only other adult and legal guardian of the Rimer children, including J.R. As such, Rimer directly blamed Colleen for J.R.'s death, and Colleen indirectly blamed Rimer for J.R.'s death. Moreover, no other person was legally responsible for the care of J.R. Not only were their defenses mutually antagonistic, but they were also mutually exclusive: one of the two was responsible for caring for J.R. when he died. If jurors believed Colleen's testimony that she was unable to care for J.R. due to her disability, the necessary inference is that Rimer failed to assume the responsibility to care for J.R. in Colleen's absence.

Even if the initial joinder was proper under Nevada law, which this Court does not review, the failure to sever Rimer and Colleen's trials required that the jury hear both Rimer and Colleen reject responsibility for J.R.'s death. Mutually antagonistic defenses are not per se prejudicial, *see Zafiro*, 506 U.S. at 538, and even a prejudicial joinder does not necessarily require severance, *see id.* at 539. However, the U.S. Supreme Court has recognized that joint trials may be fundamentally unfair such that the defendant is denied his due process right to a fair trial. *See id.* at 538-39. The specific circumstances of their defenses and the inflammatory facts of this case indicate Rimer was prejudiced by the failure to sever his trial from Colleen's, and the prejudice was likely be compounded by the joinder of abuse charges with the death charges (as discussed in ground 4). For the death charges specifically, each defendant relied upon the other's responsibility to

36

1  exonerate themselves—someone was legally responsible for J.R.'s care when he died,

2  and if it was not Colleen, then it necessarily was Rimer. Moreover, the jury heard both

3  parents reject responsibility for J.R.'s death, increasing the likelihood that the jury would

4  conclude both parents were culpable, or were otherwise criminally negligent.

5  Additionally, the Court agrees with Rimer that the general jury instructions given likely

6  were insufficient to cure the prejudice inherent in the joined trial. Jury Instruction No. 3

7  told the jury it was their "duty to give separate, personal consideration to the case of each

8  individual defendant" by "analyz[ing] what the evidence shows with respect to that

9  individual, leaving out of consideration entirely any evidence admitted solely against some

10  other defendant." (ECF No. 31-9 at 8.) While "[a] habeas court must presume that jurors

11  follow the jury instructions," *Busby*, 661 F.3d at 1017, the Ninth Circuit has expressed

12  doubt that general instructions are sufficient to cure prejudice in joined trials where the

13  joinder creates prejudice. *See, e.g.*, *Bean*, 163 F.3d at 1084 (explaining that general

14  instructions to compartmentalize evidence may be unrealistic depending on the facts of

15  the allegedly prejudicial joinder). It is therefore possible that the jury instructions did not—

16  even could not—cure the prejudice of the mutually antagonistic defenses.

17    The Nevada Supreme Court's determination that the trial court did not abuse its

18  discretion therefore resulted in an unreasonable application of federal law. The Nevada

19  Supreme Court correctly determined that there were no *Bruton*-type problems, but failed

20  to consider that the defenses were more than mutually antagonistic—they were mutually

21  exclusive. Colleen's statement that she relied on others in the home to care for J.R.

22  necessarily implicated Rimer because he was the only other adult in the home and J.R.'s

23  other parent. Accordingly, one of the two would be legally responsible for his care.

24  Moreover, the Nevada Supreme Court did not appear to address the compounded

25  prejudice of the jury hearing both parents reject responsibility for J.R.'s death. Because

26  the jury could not accept both Rimer and Colleen's defenses, and that by hearing both

27  defenses there was a strong risk the jury would find both parents criminally negligent, the

28  Nevada Supreme Court's review did not reasonably consider the mandate from *Zafiro*

1   that the jury must be protected from hearing mutually antagonistic defenses that would

2   prevent them from reliably ascertaining Rimer's guilt or innocence.

3       For these reasons, the Court finds that under the circumstances of this case and

4   the nature of the two defenses, Rimer and Colleen's trials could not proceed jointly

5   without depriving Rimer of his right to due process. Accordingly, the Nevada Supreme

6   Court's denial of relief resulted in an unreasonable application of federal law. However,

7   for the same reasons as explained in ground 4, the Ninth Circuit has indicated that the

8   law surrounding severance of defendants may not be clearly established. The Court

9   therefore concludes that Rimer is not entitled to federal habeas relief for ground 5.

10  Because the Court finds that the defenses were mutually antagonistic and did prejudice

11  Rimer, and that general jury instructions given likely did not cure that prejudice, the Court

12  will issue a certificate of appealability for ground 5. Rimer may seek review from the

13  Ninth Circuit on whether the Nevada Supreme Court unreasonably applied "clearly

14  established" federal law in this circumstance.

15              **F.    Ground 6—Prosecutorial Misconduct**

16      In ground 6, Rimer alleges that his right to due process and a fair trial were

17  violated as a result of prosecutorial misconduct. (ECF No. 17 at 41.) Rimer alleges five

18  instances of misconduct, which this Court will address in turn: (1) repeated use of the

19  term "beating," (2) suggesting facts not in evidence, (3) shifting the burden of proof, (4)

20  commenting on the right to silence, and (5) exhortation of the jury. (*Id.* at 41-45.)

21              **1.    Prosecutorial Misconduct Standard**

22      "[T]he touchstone of due process analysis in cases of alleged prosecutorial

23  misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v.*

24  *Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors'

25  comments 'so infected the trial with unfairness as to make the resulting conviction a

26  denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting

27  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this

28  Court looks to various factors: "the weight of the evidence, the prominence of the

comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

## 2.   Ground 6a—Repeated Use of "Beating"

During direct examination of Q.R., the prosecutor asked if "there had been occasions where [Rimer] used to beat" him. (ECF No. 30-38 at 36.) Q.R. responded, "[h]e gave me spankings." (*Id.*)  A little while later, the prosecutor stated, "I would like to go back to the questions about each one of the beatings with the paddle or belt." (*Id.* at 39.) Rimer's counsel "object[ed] to the characterization of beating." (*Id.*) The state district court sustained the objection, explaining that Q.R.'s "term was spanking." (*Id.*) A few questions later, the prosecutor asked Q.R. to give "an example of what . . . [he] did do that would cause [Rimer] to beat [him] with the paddle or belt." (*Id.* at 40.) Rimer's counsel objected, and the state district court "sustain[ed] the objection as to beating." (*Id.*) The prosecutor apologized. (*Id.*)

Later, during cross-examination of a defense witness, the prosecutor asked, "[w]ere you aware that Mr. Rimer used oars that he used to beat his children with." (ECF No. 30-39 at 155.) The defense witness responded, "I have been told that." (*Id.*) A few questions later, the prosecutor asked, "[t]he fact that you heard from Mr. Rimer that he had an oar to beat his children, that didn't cause you concern." (*Id.* at 156.) Rimer's counsel objected "to the term beat." (*Id.*) The prosecutor argued that the defense witness "agreed with [him] when [he] used the term," but the state district court sustained the objection, instructing the prosecutor to use the word "discipline." (*Id.*) The prosecutor

1  then asked the defense witness whether he had previously used the term beat, and the

2  defense witness indicated that he did not "like the term beat." (*Id.*)

3      During closing argument, the prosecutor made the following remarks: (1) Q.R.

4  "had been the subject of the discipline and the beatings with a boat oar and a belt," (2)

5  Q.R. "was beaten with a boat oar and a belt," (3) Q.R. testified "that those beatings took

6  place at least on occasions between 10 and 15 times or 20 to 25 times," (4) "the paddles

7  broke during actual beatings of the Rimer children," (5) Q.R.'s "beating was . . .

8  confirmed by his brother Brandon," and (6) Rimer "was in a full on rage" during "the

9  beatings." (ECF No. 31-4 at 96, 104-05.)

10      In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

11      First, Rimer claims that the prosecutor committed misconduct by
characterizing spankings as beatings. However, any harm arising from the

12  prosecutor's use of the term "beatings" during his examination of the
witnesses was cured when the district court sustained Rimer's objections,

13  and the prosecutor did not commit misconduct by using the term during
closing argument because he was free to argue facts or inferences

14  supported by the evidence and to offer conclusions on disputed issues
during closing argument. *See Miller v. State*, 121 Nev. 92, 100, 110 P.3d

15  53, 59 (2005).

16  (ECF No. 18-7 at 29.)

17      Even if the prosecutor committed misconduct by using the term "beating" on one

18  or two occasions during a two-week trial after an objection regarding the use of that word

19  had been sustained, the Nevada Supreme Court reasonably determined that Rimer fails

20  to demonstrate that this alleged misconduct "so infected [his] trial with unfairness as to

21  make [his] resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see*

22  *also Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir. 2000) (determining, in part, that

23  the petitioner was not denied a fair trial due to prosecutorial misconduct because "the

24  misconduct was isolated"). Indeed, as the Nevada Supreme Court reasonably noted,

25  the state district court sustained Rimer's objections to the use of the word and instructed

26  the prosecutor to use the word "discipline" instead. And regarding the prosecutor's

27  closing argument, the comments were well within the bounds of professional conduct,

28  as the prosecutor merely presented his view of the evidence: the use of a boat oar to

discipline his children amounting to beatings. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence"). Thus, the Nevada Supreme Court's denial of relief on Rimer's prosecutorial misconduct claim regarding the use of the term "beating" was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Rimer is not entitled to federal habeas relief for ground 6a.

### 3.   Ground 6b—Suggestion of Facts Not in Evidence

During cross-examination of Dr. Carl Dezenberg, J.R.'s pediatric gastroenterologist, the prosecutor asked if it would cause him "concern if [he] learned that the week prior to the removal of [J.R.'s] G-tube by Dr. Reyna, Colleen Rimer hadn't cleaned the site." (ECF No. 31-1 at 166.) Dr. Dezenberg responded that he had not "hear[d] anything to that affect." (*Id.*) A few questions later the prosecutor asked, "[w]ould it have caused you concern if you had learned that on the day that [J.R.] was presented to have his G-tube removed by Dr. Reyna that Dr. Reyna refused to do surgery because [J.R.] was so dirty." (*Id.* at 167.) Rimer's counsel objected, explaining that those were "[f]acts not in evidence." (*Id.*) The state district court inquired whether the prosecutor was asking hypothetically, and the prosecutor answered in the affirmative. (*Id.*) Dr. Dezenberg responded that those facts would cause him concern. (*Id.* at 168.)

In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

> Third, Rimer claims that the prosecutor committed misconduct by conveying facts not in evidence through a hypothetical question posed to a defense expert. Dr. Carl Dezenberg testified that he did not have any concerns about the care that [J.R.] was receiving from his family. In an attempt to undermine Dr. Dezenberg's testimony, the prosecutor asked,
>> Would it have caused you concern if you had learned that on the day that [J.R.] was presented to have his G-tube removed by Dr. Reyna that Dr. Reyna refused to do surgery because [J.R.] was so dirty he needed to have him bathed before [he] was willing to perform the surgery?
> The district court allowed the question after determining that it was being posed as a hypothetical question. The prosecutor's question did not constitute misconduct because opposing parties are allowed to explore and challenge the basis of an expert witness's opinion. *See* NRS 50.285(2) (an expert may base his opinion on facts and data that are not admissible in evidence); *Blake v. State*, 121 Nev. 779, 790, 121 P.3d 567, 574 (2005) ("It

41

1

2

3

4

> is a fundamental principle in our jurisprudence to allow an opposing party to explore and challenge through cross-examination the basis of an expert witness's opinion."); *Anderson v. Berrum*, 36 Nev. 463, 469, 136 P. 973, 976 (1913) ("On cross-examination it is competent to call out anything to modify or rebut the conclusion or inference resulting from the facts stated by the witness on his direct examination.").

5

(ECF No. 18-7 at 29-30.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

As the Nevada Supreme Court—the final arbiter of Nevada law—reasonably determined, it was not improper for the prosecutor to ask Dr. Dezenberg a hypothetical question based on facts not in evidence, as such a question is allowed by Nevada law. *See* NRS § 50.285(2) ("If of a type reasonably relief upon by experts in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). Further, it is unlikely that the prosecutor's statements in this regard had any real effect on the jury's verdict, as there was various testimony that J.R.'s G-tube site was dirty, including testimony by a Nevada Early Intervention Services employee that J.R.'s G-tube site was leaking, red, not being cleaned properly, and necrotic. (ECF No. 31-1 at 49, 50, 65, 66.) Consequently, the Nevada Supreme Court's denial of relief on Rimer's prosecutorial misconduct claim regarding the hypothetical question posed to Dr. Dezenberg was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Rimer is not entitled to federal habeas relief for ground 6b.

20

#### 4.    Ground 6c—Shifting the Burden of Proof

21

22

23

24

During closing argument, the prosecutor commented, "what evidence is there to suggest that [Rimer and Colleen] were sick. How about a witness." (ECF No. 31-4 at 88.) Rimer's counsel objected, arguing that such a comment amounted to burden shifting. (*Id.*) The state district court overruled the objection. (*Id.* at 89.)

25

In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

26

27

28

> Fourth, Rimer claims that the prosecutor committed misconduct by arguing that the defense failed to prove that the Rimers were sick on the day of [J.R.]'s death. During the opening statements, both Rimer and Colleen claimed that the evidence would show that they were sick and spent most of the day in bed. The prosecutor acknowledged these statements during closing argument and asked, "what evidence is there to suggest that they

1

2      were sick. How about a witness." This argument was not misconduct
       because the prosecutor was merely pointing out "that the defense failed to
       substantiate its theory with supporting evidence." *Evans v. State*, 117 Nev.
3      609, 631, 28 P.3d 498, 513 (2001); *see Leonard v. State*, 117 Nev. 53, 81,
       17 P.3d 397, 415 (2001).

4      (ECF No. 18-7 at 30.)

5              As the Nevada Supreme Court reasonably determined, this comment was not

6      misconduct. "A prosecutor may, consistent with due process, ask a jury to convict based

7      on the defendant's failure to present evidence supporting the defense theory."

8      *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005). Here, Rimer's defense, at

9      least in part, was that he was sick on June 8, 2008, and as such, "[h]e was never

10     informed that [J.R.] was missing" or that "there was a problem." (*See* ECF No. 30-35 at

11     57–58 (opening statement by Rimer's counsel that "Stan Rimer woke up feeling ill" on

12     the morning of June 8, 2008, and went to bed after church because "[h]e was feeling

13     puny, bad").) Therefore, the Nevada Supreme Court's denial of relief on Rimer's

14     prosecutorial misconduct claim regarding the prosecutor's comment about the lack of

15     evidence to support the defense's theory was neither contrary to, nor an unreasonable

16     application of, clearly established federal law and was not based on an unreasonable

17     determination of the facts. Rimer is not entitled to federal habeas relief for ground 6c.

18                     **5.     Ground 6d—Commenting on the Pre-Arrest Right to Silence**

19             During closing argument, the prosecutor commented,

20             [Rimer's counsel] stood up there and said it's overcharging because CPS
               could have done this for years. Why wasn't it done before by CPS. The
21             answer is simple. When you kill your kid, you don't have the right to stop the
               homicide cops from interviewing you. You don't have the right to ask [Q.R.]
22             and [E.R.] and [S.R.] and Brandon what is going on in that house. At that
               point, their brother is dead, they don't have the pressure of not saying things
23             to their teachers, to CPS, to other church members. At that point, they tell
               the whole horrifying story. And it's corroborated by every witness, every
24             note, every piece of evidence that's been admitted in this case. Stanley
               Rimer for years precluded the system from helping these kids.
25

26     (ECF No. 31-4 at 185-86.)

27             In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

28

                                                    43

1

2

> Rimer further claims that the prosecutor committed misconduct by . . . arguing that Rimer had no choice but to speak to authorities after [J.R.'s] death . . . .
> We have carefully reviewed [this claim] and, to the limited extent that there was error, we conclude that the error did not affect Rimer's substantial rights and therefore he has not demonstrated plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (An error that affects the substantial rights of a defendant is one that "affected the outcome of the district court proceedings.").

3

4

5

6   (ECF No. 18-17 at 33.)

7       The State's comments on a defendant's silence violate the self-incrimination

8   clause of the Fifth Amendment. *Griffin v. California*, 380 U.S. 609, 614 (1965). While the

9   State violates *Griffin* when it "direct[ly] comment[s] about the defendant's" silence, the

10  State only violates *Griffin* when it "indirect[ly] comment[s about the defendant's

11  silence] . . . 'if it is manifestly intended to call attention to the defendant's [silence] or is

12  of such a character that the jury would naturally and necessarily take it to be a comment

13  on the [defendant's silence].'" *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (quoting

14  *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)).

15      Read objectively, the prosecutor's comment was not manifestly intended to call

16  attention to Rimer's pre-arrest silence, or lack thereof, or was of such a character that the

17  jury would naturally and necessarily take it to be a comment on Rimer's pre-arrest silence,

18  or lack thereof. *See Hovey*, 458 F.3d at 912. Rather, the prosecutor's comment was

19  merely highlighting, in response to Rimer's counsel's argument, that criminal charges

20  were not previously brought by CPS because Rimer had previously prohibited his children

21  from speaking with CPS employees, a prohibition he was not able to enforce when

22  homicide detectives were investigating J.R.'s death. Accordingly, the Nevada Supreme

23  Court's denial of relief on Rimer's prosecutorial misconduct claim regarding the

24  prosecutor's alleged comment on Rimer's pre-arrest silence, or lack thereof, was neither

25  contrary to, nor an unreasonable application of, clearly established federal law and was

26  not based on an unreasonable determination of the facts. Rimer is not entitled to federal

27  habeas relief for ground 6d.

28  ///

44

### 6.   Ground 6e—Exhortation of the Jury

During closing argument, the prosecutor commented, "Stanley Rimer for years precluded the system from helping these kids. Yes, as part of that system, not part of the CPS system, I feel horrible that the system failed [J.R.]. But don't let it fail him again." (ECF No. 31-4 at 186.)

In affirming Rimer's judgment of conviction, the Nevada Supreme Court held:

> Rimer further claims that the prosecutor committed misconduct by . . . exhorting the jurors not to let the system fail [J.R.] again.
> We have carefully reviewed [this claim] and, to the limited extent that there was error, we conclude that the error did not affect Rimer's substantial rights and therefore he has not demonstrated plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (An error that affects the substantial rights of a defendant is one that "affected the outcome of the district court proceedings.").

(ECF No. 18-17 at 33.)

A prosecutor shall not "try to exhort the jury to 'do its job' [because] that kind of pressure . . . has no place in the administration of criminal justice." *United States v. Young*, 470 U.S. 1, 18 (1985) (ultimately concluding that, "reviewed in context," the statements did not undermine fundamental fairness and "contribute to a miscarriage of justice"). Even if the prosecutor's statement that the jury should not let the system fail J.R. amounted to misconduct, the Nevada Supreme Court reasonably concluded that Rimer was not entitled to relief. Indeed, Rimer fails to demonstrate that this single comment at the end of a lengthy closing argument that was brought about in response to Rimer's counsel's argument[11] "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-38. Thus, the Nevada Supreme Court's denial of relief on Rimer's prosecutorial misconduct claim regarding the prosecutor's exhortation comment was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Rimer is not entitled to federal habeas relief for ground 6e.

---

[11]Rimer's counsel argued that "[t]he best evidence that there was no criminal abuse or neglect between 2004 and 2008 is the fact that CPS never filed a case . . . in family court." (ECF No. 31-4 at 124.)

### G.    Ground 7—Cumulative Error

In ground 7, Rimer alleges that cumulative errors throughout the trial served to violate his right to due process. (ECF No. 17 at 46.) In affirming Rimer's judgment of conviction, the Nevada Supreme Court held: "Rimer claims that cumulative error requires reversal of his convictions. However, because Rimer has failed to demonstrate any trial error, we conclude that he was not deprived of a fair trial due to cumulative error." (ECF No. 18-7 at 33-34.)

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court has not identified any definite errors, so there is no cumulative error. Rimer is denied federal habeas relief for ground 7.

## V.    MOTION FOR HEARING

Rimer moves for an evidentiary hearing to present additional evidence on whether he can overcome the default via *Martinez* on ground 1. (ECF No. 74.) The Supreme Court has recently held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the prisoner can satisfy 28 U.S.C. § 2254(e)(2)'s stringent requirements under AEDPA. *Shinn v. Ramirez*, 142 S.Ct. 1718, 1734 (2022). Rimer fails to demonstrate that those stringent requirements are met here. Further, neither further factual development nor any evidence that may be proffered at an evidentiary hearing would entitle Rimer to relief on ground 1 because he fails to demonstrate prejudice. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or

1  otherwise precludes habeas relief, a district court is not required to hold an evidentiary
2  hearing."). As such, Rimer's motion is denied.

3  **VI.    CERTIFICATE OF APPEALABILITY**

4  This is a final order adverse to Rimer. Rule 11 of the Rules Governing Section
5  2254 Cases requires this Court to issue or deny a certificate of appealability (COA). This
6  Court has *sua sponte* evaluated the claims within the petition for suitability for the
7  issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65
8  (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the
9  petitioner "has made a substantial showing of the denial of a constitutional right." With
10  respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable
11  jurists would find the district court's assessment of the constitutional claims debatable or
12  wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.
13  880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists
14  could debate (1) whether the petition states a valid claim of the denial of a constitutional
15  right and (2) whether this Court's procedural ruling was correct. *Id.*

16  As explained above, this Court finds that a certificate of appealability is warranted
17  for grounds 4 and 5. It is unclear from the current state of Ninth Circuit law whether
18  failure to sever counts is reviewable in a collateral habeas case. If it is, then relief should
19  be granted for grounds for and 5. This Court declines to issue a certificate of
20  appealability for its resolution of any procedural issues or any of Rimer's remaining
21  grounds.

22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

47

1

## VII.    CONCLUSION

2       It is therefore ordered that Rimer's first amended petition for a writ of habeas

3  corpus pursuant to 28 U.S.C. § 2254 (ECF No. 17) is denied.

4       It is further ordered that the motion for an evidentiary hearing (ECF No. 74) is

5  denied.

6       It is further ordered that a certificate of appealability is granted for grounds 4 and

7  5 only, and is denied for Rimer's remaining grounds.

8       The Clerk of Court is directed to enter judgment accordingly and close this case.

9       DATED THIS 20th Day of July 2022.

10

11       _____

         MIRANDA M. DU
12       CHIEF UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28